# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Edward A. Bobrick | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 1258 | **DATE** | 3/3/2004 |
| **CASE TITLE** | Maryann Kavadius vs. JoAnne B. Barnhart | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Defendant's Motion for Summary Judgment [28-1] is denied and Plaintiff's Motion for Summary Judgment or Remand [25-1] is granted. Enter Memorandum Order.

*Edward A. Bobrick*

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | **Document Number** |
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | | MAR 08 2004 | 29 |
| | Docketing to mail notices. | | date docketed | |
| ✓ | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | |
| | | | 3/3/2004 | |
| SRB | courtroom deputy's initials | | date mailed notice | |
| | | Date/time received in central Clerk's Office | SB | |
| | | | mailing deputy initials | |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

MARYANN KAVADIUS, )
)
    Plaintiff, )
)
vs. ) No. 02 C 1258
) Edward A. Bobrick,
JO ANNE B. BARNHART, ) Magistrate Judge
Commissioner of Social Security, )
)
    Defendant. )

DOCKETED

MAR 0 8 2004

## MEMORANDUM ORDER

Plaintiff Maryann Kavadius brings this action pursuant to 42 U.S.C. § 405(g) to review a final decision of the Commissioner of Social Security ("Commissioner") denying her Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").

### I. BACKGROUND

Plaintiff filed an application for DIB and SSI on May 10, 1996, alleging she was disabled since birth, as a result of a learning disability and asthma. (Administrative Record ("R.") at 195-199). Her application was denied at the initial levels of administrative review (R. 200-206), and she requested an administrative hearing. (R. 210-214). On August 27, 1998, an administrative law judge ("ALJ") conducted a hearing at which plaintiff, who was represented by counsel, appeared and testified, along with her roommate. (R. 33-130). In addition, Thomas Dunleavy, a vocational expert, also testified. (R. 33, 99-126). The ALJ considered all the evidence of record and, in a

29

decision dated September 17, 1998, found that plaintiff was not disabled because she retained the ability to perform a significant number of jobs in the economy. (R. 474-484).

Plaintiff filed a request for review of the decision and submitted additional evidence to the Appeals Council. (R. 498-506). On May 1, 2000, the Appeals Council issued an order remanding the case for a second administrative hearing. (R. 507-509). On August 17, 2000, a second ALJ convened an administrative hearing. (R. 131-184). Plaintiff – who was represented by counsel – again appeared and testified along with her roommate. (R. 131). James Radke also appeared and testified as a vocational expert. (R. 131, 177-183). After considering all the evidence of record, on October 25, 2000, the ALJ determined that plaintiff was not disabled because she retained the ability to perform her past relevant work. (R. 16-22). This became the final decision of the Commissioner when the Appeals Council denied plaintiff's request for review of the decision on December 27, 2001. (R. 8-9).

## A. Evidence of Record

Plaintiff was born on June 16, 1969, making her thirty-one years old at the time of the ALJ's decision. (R. 46). She is 5'6" tall and weighs 189 pounds. (R. 380). Plaintiff graduated from high school, and has a Bachelor's Degree in art, which took her twelve years to obtain. (R. 150-151). After she was diagnosed with a learning disability in 1994, she received special assistance from tutors in her classes. (R. 150-151). During that time, she also worked at several part-time jobs, ranging in duration from two months to eight

2

months. (R. 245-250). Her eight-month job was at a photo lab in 1995 and 1996. (R. 245). She claims to have quit that job over communication problems with the manager. (R. 136). The manager would not allow plaintiff to put up signs reminding her how to mix the development chemicals. (R. 136-137). In addition, the burden of holding the job and going to school became too difficult. (R. 136-137).

The medical evidence indicates that plaintiff was diagnosed with mild von Willebrand's disease, a bleeding disorder[1], in 1987. (R. 283). She was advised to wear a medic alert bracelet, and take prompt action in case of severe injury or signs of gastrointestinal bleeding. (R. 283). Plaintiff also suffers from mild asthma, with infrequent attacks one or two times a year. (R. 359). She has undergone counseling to help her deal with her parent's divorce and abuse she suffered as a child. (R. 269).

Clearly, plaintiff's significant medical problems in terms of her ability to work are her learning disability and her auditory processing deficit. In 1994, plaintiff sought evaluation after experiencing difficulty is some of her more academically oriented college courses. (R. 269). At that time, Sharon Maurer-Schwartz, Ed.S., an educational psychologist, conducted intelligence testing. (R. 269-281). Plaintiff's test scores revealed that she does significantly better in tasks involving non verbal mediation and reasoning than she does on tasks that require her to process using verbal skills. (R. 271). As such,

---

[1] Von Willebrand's disease is the most common hereditary hemorrhagic disease, and is often manifested in childhood by easy bruising and prolonged bleeding after tooth extraction, tonsillectomy, or other surgical procedures. The Merck Manual, at 925-27 (17th ed. 1999).

3

Dr. Maurer-Schwartz explained that plaintiff learned best in situations involving manipulating things, copying designs, and audio-visual input or output. (R. 271). Plaintiff's test scores also showed weaknesses in auditory and visual sequencing, distractibility, short term memory, and auditory comprehension. (R. 272). Dr. Maurer-Schwartz felt that a learning disability was present, and that plaintiff would benefit from teaching designed to ameliorate these shortcomings, counseling to help with self esteem issues, and vocational counseling. (R. 272-273).

In March of 1995, Rosalie Kirschner, Ph.D., conducted a psychological evaluation of plaintiff. (R. 293). Testing revealed plaintiff's scores indicative of innate intelligence were significantly lower than those indicative of achievement, which was "definitely reminiscent of a learning disability." (R. 293-294). This reduced her overall score to the low average range. (R. 295). Tests also indicated that her learning difficulties were not due to perceptual motor deficit or visual-spatial organizational lack of development. (R. 295). She exhibited difficulty reading aloud from sixth-grade level material. (R. 295). Plaintiff's lack of self-esteem appeared "to pervade her whole being." (R. 295). Dr. Kirschner felt plaintiff needed not only psychotherapy, but treatment for her learning disabilities as well. (R. 295). She diagnosed plaintiff with post-traumatic stress disorder stemming from her history of mental and physical abuse, and adjustment disorder. (R. 299-300). She felt plaintiff would need assistance managing her funds. (R. 300).

4

Dr. Maurer-Schwartz undertook further evaluation of plaintiff in April of 1996. (R. 336-347). She noted that plaintiff was diligent in following through on suggestions for bettering her situation with therapy, occupational counseling, and the like. (R. 337). Again, Dr. Maurer-Schwartz conducted a series of tests. Plaintiff performed poorly – below average or low average – on all areas dealing with auditory processing. (R. 337-338). Plaintiff's scores also indicated significant weakness in the areas of written language aptitude, mathematics aptitude, and reading aptitude. (R. 338). Her strengths were in the areas of visual perception and non verbal reasoning. (R. 338). Plaintiff's scores were, once again, indicative of a learning disability. (R. 338). Dr. Maurer-Schwartz felt plaintiff would perform best when material was presented visually as well as auditorially, and in small group setting and quiet environments. (R. 338). These concerns carry over to the workplace, where plaintiff would need to receive job instructions slowly and in a quiet setting; if at all possible, tasks should be demonstrated to insure plaintiff's understanding. (R. 338). Dr. Maurer-Schwartz felt plaintiff was bright, motivated, and artistically talented, but noted that the severity of her learning disability greatly impacted almost all aspects of plaintiff's life. (R. 339).

In June of 1996, plaintiff's counselor, Imy Wax reported on the effects of plaintiff's learning disability. (R. 355-358). She noted it takes a "very long time" for plaintiff to process what she hears, and a long time to then organize her thoughts and logically reply. (R. 355). Thus, plaintiff needed things stated slowly and in short sentences. (R. 355).

5

She also had great difficulty understanding what is said if there is a crowd and background noise. (R. 355). Those she has to deal with are often impatient and frustrated with her. (R. 355). As a result, plaintiff is thwarted in tasks such as getting information on student loans or dealing with her landlord. (R. 356). When plaintiff worked at a small photo lab, she was unable to process the various verbal commands and "pick up the next job" as easily as supervisors expected, and she eventually quit. (R. 356). According to Ms. Wax, plaintiff relies a great deal on a friend, Margaret, who acts as an "interpreter" for her, helping her "resolve even the smallest verbal exchange." (R. 356). Ms. Wax thought that if plaintiff could find a situation where she could work in her own at home, it would be ideal for her. (R. 357).

Beginning in late 1996, plaintiff underwent remediation twice a week with Jennifer Cannon, a learning disabilities specialist, in connection with her college courses. (R. 373). These sessions were designed to teach plaintiff study skills and strategies to deal with her academic classes. (R. 373). Ms. Cannon noted that plaintiff's reading performance fell below the 1st percentile, her writing fell between the 2nd and 16th percentiles, and that her math performance was comparable. (R. 373). In March of 1997, Ms. Cannon reported that although plaintiff could care for herself, she had significant difficulty paying bills and managing her finances due to her communication deficiencies. (R. 376). She indicated that plaintiff had difficulty understanding and remembering spoken and written language, which compromised her ability to communicate with others. (R. 376). Ms. Cannon also

6

reported that plaintiff became "overloaded' and confused in the presence of "extraneous auditory stimuli." (R. 376).

In April of 1997, Dr. Mary Fry reported that plaintiff was able to care for herself and do simple shopping, but that she had difficulty processing verbal and written information and needed help paying bills. (R. 386). Dr. Fry stated that plaintiff got lost in unfamiliar locations or when under stress. (R. 386). She reported that plaintiff was easily overwhelmed, especially in noisy or busy environments. (R. 386). According to Dr. Fry, plaintiff could not function well under mild work pressure. (R. 387).

Jennifer Cannon reviewed her course of remediation with plaintiff in June, 1997. (R. 400-402). She reiterated plaintiff's deficiencies in processing written and spoken language, and noted that plaintiff could become "so taxed" at times in the classroom as to get a migraine headache. (R. 401). Reading for any length of time would also result in a migraine. (R. 401). Ms. Cannon felt plaintiff's limitations would not allow her to go to school while working part time. (R. 401). "As for employment," Ms. Cannon stated:

> it takes [plaintiff] a very long time to process what she hears and to formulate what she wants to say. Auditory discrimination difficulties frequently result in her misunderstanding what she was told. Auditory memory difficulties severely limit what she is able to remember. The length of time it takes her to process what she was told and to formulate a response elicits frustration and impatience from many people.
> \*   \*   \*
> The level of her language difficulties . . . have the potential to result in significant job-related difficulties for her as an unskilled employee.

7

(R. 402). Ms. Cannon thought that if plaintiff could complete art school, she might be prepared to be gainfully employed in an area where her limitations would not pose as significant a barrier to her being an effective employee. (R. 402).

Plaintiff's treating therapist, Ms. Wax, completed a psychiatric review technique form ("PRTF") in September of 1997, indicating plaintiff suffered from an organic mental disorder, which met listing 12.02 of the Commissioner's Listing of Impairments. 20 C.F.R. Pt. 404, Subpt. P, App. 1. (R. 408-416). She indicated this resulted in memory impairment, perceptual and thinking disturbances, loss of measured intellectual ability of at least 15 I.Q. points, and difficulty processing language. (R. 410). It also caused marked restrictions in daily living, moderate difficulty in social functioning, constant deficiencies of concentration, persistence or pace resulting in failure to complete tasks in a timely manner, and continual deterioration decompensation in a worklike setting. (R. 415).

In October of 1998, Jeanne Ferre, Ph.D. performed a central auditory evaluation of plaintiff. (R. 502-506). Tests showed plaintiff had adequate peripheral hearing. (R. 504). Results tended to rule out a significant central auditory receptive dysfunction, but supported a probable output-organization defect. (R. 504).

At her administrative hearing, plaintiff testified that she lived with a friend, Terry Hutchinson. (R. 136). She had to quit the job she held the longest, at the photo lab, due to communication problems with the manager and difficulty with school. (R. 136-137).

8

Plaintiff stated that she was trying to work at home on her computer, offering graphic illustration work for sale. (R. 139). She is able to work at her own pace, but was only able to make $650 in the first year. (R. 155). She also said she does cooking and cleaning around the apartment. (R. 139). Plaintiff said that, while she could drive a car, she had difficulty reading signs. (R. 156). She described the difficulties she had with communication in her most recent job designing security holographics. (R. 141-146). She was apparently fired because she could not understand the employment manual and was unable to learn the necessary computer programs by reading about them. (R. 141-146). The job lasted just two months. (R. 141). At the photo lab, the manager would not allow her to post signs reminding her how to mix the developing chemicals. (R. 146). Instead, she had to ask others until she eventually memorized the mixtures. (R. 147). Her problems learning the job and communicating with her supervisor, along with the demands of college, forced her to leave the job. (R. 136-137). Plaintiff explained that, while she was in college, she had tutors to assist her with her studies and taking class notes. (R. 151). She testified that she had trouble with her memory, such as remembering all of a conversation or a page she read out of a book. (R. 158). She said she gets overwhelmed in situations where she has difficulty communicating and has no support. (R. 159).

Plaintiff's roommate, Terry Hutchinson, also testified. (R. 159). Ms. Hutchinson corroborated plaintiff's testimony regarding her difficulty maintaining employment. (R. 161). She said plaintiff felt a great deal of frustration dealing with supervisors due to

9

communication problems. (R. 161). In her opinion, though, plaintiff's supervisors had no more than ordinary expectations; such as that plaintiff be able to learn a computer program by reading the manual. (R. 162-163).

Kenneth Kessler, a clinical psychologist, testified as a medical expert after reviewing the record. (R. 164). He went over plaintiff's abilities, as reflected in test scores, to read single words, words in context, and process auditory information. (R. 165-168). According to Dr. Kessler, the tests revealed that, while plaintiff can read single words, she has a limited ability to read context and derive meaning. (R. 167). In addition, plaintiff was also limited in her ability to derive information by listening. (R. 167). This combination of deficiencies meant that plaintiff could best learn by demonstration or by doing. (R. 167). At one point in his testimony, Dr. Kessler compared plaintiff's situation to that of a blind person:

> For somebody who couldn't read text, ordinarily we'd simply substitute auditory input for that. . . . In other words, if I'm blind we're going to give me books on tape and I'm fine. . . . But here in this situation when you make that substitution you . . . still have trouble.

(R. 173). Turning his attention toward listing 12.02 of the Commissioner's listing of impairments – which covers organic mental impairments – he felt plaintiff was under a moderate restriction in her daily activities, and slight to moderate restriction in social functioning. (R. 168). He thought plaintiff only seldom experienced deficiencies of concentration (R. 169), but also testified that she would have difficulty understanding and

responding appropriately in a busy or noisy work setting, "which might come under concentration . . . so we could put that somewhere under concentration." (R. 170). He stated that plaintiff experienced deterioration in a work setting repeatedly. (R. 169). Her ability to understand and remember detailed instructions was markedly limited, as was her ability to respond to changes in a work setting. (R. 169). Dr. Kessler felt plaintiff could perform adequately interacting with one individual in a quiet setting, but if it were a busy or noisy environment, it would be very difficult for plaintiff. (R. 170). He indicated that, while plaintiff's impairment did not exactly fit listing 12.02 or 12.05, her "severity level would equal the intensity of ... either of those listings ..." (R. 168, 175). Yet, moments later, the doctor also testified that he did not "think [plaintiff] meets or equals either of those." (R. 175).

James Radke then testified as a vocational expert. (R. 180). The ALJ asked Mr. Radke to consider the prospects of the following hypothetical worker:

> a 31-year-old female with a Bachelor's Degree, the [plaintiff's] work experience . . . diagnosed with von Wilgram's [sic] disease. She also has cognitive difficulties which show in reading and auditory comprehension areas. For the purposes of this hypothetical, I don't believe the record demonstrates the exertional impairments or limitations. The non exertional that would, first of all, limit the work that should not involve working around dangerous machinery or working with sharp, pointed objects, who [sic] would further limit the work that the instructions should not be detailed. The instructions should not be written or oral. They should be demonstrated in order to do the job. There should be what I view as a relatively stable workplace where you will not have to make adaptations to changes in the workplace. I believe the strength has been identified as being able to work with the visual, spacial tasks rather than working say with complex numbers.

11

However, further limit the workplace that you wouldn't be dealing with the large volume of people. You could basically deal with one person at a time.

(R. 180). The ALJ then asked whether such an individual would be able to perform any of plaintiff's past relevant work. (R. 180). The vocational expert felt such a person could not perform administrative assistant or sales work. (R. 181). He noted that, in terms of the photo lab position, much of the technology had changed meaning she could only work in those organizations that had not updated; perhaps one-third of such jobs. (R. 181). According to Mr. Radke, "to the extent she would be forced to use the older technology, she would be impaired." (R. 181). Plaintiff's counsel then pointed out that the record arguably demonstrated that, as a result of plaintiff's learning disability:

> it takes her a long time to process information that she takes in audibly. That she is subject to frustration, episodes of frustration in the workplace. That she has concentration and memory problems, episodes of deteriorating, concentration and memory, and that she has disagreements with her supervisors. She thinks they don't understand her and so forth and she gets overwhelmed. And that to learn something new she must rely upon demonstration rather than oral or, you know, written kinds of instruction.

(R. 182). The VE then testified that if a person had a great deal of difficulty interacting with supervisors, with auditory comprehension, and with busy environments in terms of sound, that would impact "very negatively in ability to hold that kind of position." (R. 183).

## B. ALJ's Decision

After considering all the evidence of record, the ALJ determined that while the plaintiff suffered from several severe impairments – a learning disability, von Willebrand's disease, asthma, post traumatic stress disorder, and an adjustment disorder – plaintiff's condition did not meet or equal an impairment listed as disabling by the Commissioner's regulations. (R. 21). The ALJ also found that plaintiff's testimony as to her disability was not fully credible. (R. 21). The ALJ determined that plaintiff retained the capacity to perform work that did not require:

> performing jobs requiring detailed written instructions, working in environments of sharp objects or dangerous moving machinery, excessive pulmonary irritants, a crowded and high volume of people in the immediate environment.

(R. 21). According to the ALJ, plaintiff's past relevant work in a retail position at a camera and photo developing shop did not require these activities. (R. 21). Because plaintiff's impairments did not prevent her from performing her past relevant work, the ALJ found that plaintiff was not disabled under the Act. (R. 22). This stands as the Commissioner's decision and is presently before this court for review. 42 U.S.C. § 405(g).

# II. <u>ANALYSIS</u>

The applicable standard of review of the Commissioner's decision is a familiar one. The Social Security Regulations provide a five-step sequential inquiry to determine whether a plaintiff is disabled:

> 1) whether the plaintiff is currently employed;
>
> 2) whether the plaintiff has a severe impairment;
>
> 3) whether the plaintiff has an impairment that meets or equals one of the impairments listed as disabling in the Commissioner's regulations;
>
> 4) whether the plaintiff can perform his past relevant work; and
>
> 5) whether the plaintiff is capable of performing work in the national economy.

20 C.F.R. §§ 404.1520; 416.920; *Zurawski v. Halter,* 245 F.3d 881, 885 (7th Cir. 2001). The burden of proof is the plaintiff's through step four; if it is met, the burden shifts to the Commissioner at step five. *Id.* Here, the ALJ determined, at step four, that the plaintiff could perform her past relevant work as a photo lab technician.

The court must affirm this decision if it is supported by substantial evidence. 42 U.S.C. § 1382(c)(3). Substantial evidence is such relevant evidence as a reasonable mind might accept to support a conclusion. *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997), *citing Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427 (1971). The court may not reweigh the evidence, or substitute its judgment for that of the Social Security Administration. *Binion*, 108 F.3d at 782. Where conflicting evidence would

allow reasonable minds to differ as to whether the plaintiff is disabled, the Commissioner has the responsibility for resolving those conflicts. *Id.* Conclusions of law are not entitled to such deference, however, so where the Commissioner commits an error of law, the court must reverse the decision regardless of the volume of evidence supporting the factual findings. *Id.* In this case, we must conclude that the ALJ's decision is not supported by substantial evidence.

We begin with the ALJ's step-three determination, in which he concludes plaintiff's condition does not meet the listings. Courts require ALJs to sufficiently articulate their assessment of the record to assure the court that they considered the important evidence and to enable the court to trace the path of their reasoning. *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002). Here, the ALJ addressed the listings before any discussion of the evidence, indicating that:

> [t]he [plaintiff's] mental problems are not at the level of severity to meet
> medical listing 12.05, nor in fact any other mental listing. The [plaintiff] has
> some possible other mental impairments related to anxiety and an adjustment
> disorder but these are not at the level of severity to meet listings 12.04 or
> 12.06. The [plaintiff] does not have the marked degree of functional
> limitations as required of [sic] the Paragraph B criteria.

(R. 17). When, later in the opinion, the ALJ did arrive at the evidence relating to the listings, he rejected the opinion of lmy Wax, and relied on the opinion of Dr. Kessler, the ME, both of which dealt with listing 12.02, as opposed to 12.04 or 12.05 as the ALJ mentioned. (R. 19-20). While it may be too technical a reading of the ALJ's opinion, the

court cannot say for sure which listing the ALJ feels is relevant. This is a minor concern, however, given the balance of the ALJ's step-three analysis.

As already noted, Ms. Wax completed a PRTF that indicated plaintiff met listing 12.02. This listing covers organic mental disorders. In order for an individual to be found disabled under this listing, the individual's condition must fulfill the following requirements:

> A. Demonstration of a loss of specific cognitive abilities or affective changes and the medically documented persistence of at least one of the following:

>> 1. Disorientation to time or place; or

>> 2. Memory impairment, either short-term (inability to learn new information), intermediate, or long-term (inability to remember information that was known sometime in the past); or

>> 3. Perceptual or thinking disturbances; or

>> 4. Change in personality; or

>> 5. Disturbance in mood; or

>> 6. Emotional lability . . . and impairment in impulse control; or

>> 7. Loss of measured intellectual ability of at least 15 I.Q. points from premorbid levels or overall impairment index clearly within the severely impaired range on neuropsychological testing . . .

> AND

> B. Resulting in at least two of the following:

>> 1. Marked restriction of activities of daily living; or

2. Marked difficulties in maintaining social functioning; or

3. Marked difficulties in maintaining concentration, persistence, or pace; or

4. Repeated episodes of decompensation, each of extended duration.

\*　　\*　　\*

20 C.F.R. Pt. 404, Subpt. P, App. 1. Ms. Wax was of the opinion that plaintiff fulfilled

the memory impairment, perceptual disturbances, and 15 I.Q. point loss of section A, and

exhibited at least marked restrictions in daily living and concentration, and at least repeated

episodes of decompensation. The ALJ rejected Ms. Wax's opinion as being contrary to

plaintiff's ability to obtain a Bachelor's Degree in art in twelve years, and Ms. Wax's own

comment that plaintiff would be able to work at home or in a very quiet environment. (R.

19). In so doing, the ALJ also focused on plaintiff's Oddysean pursuit of a Bachelor's

degree, and one somewhat speculative comment on Ms. Wax's part: that if plaintiff can

work, it will have to be at home or in a very quiet environment. In so doing, the ALJ was

not really engaging in a step-three analysis of whether plaintiff's impairments met the

listings, but was reasoning that "because plaintiff can go to college or may be able to work

at home, she does not have a listed impairment." The ALJ is required to perform the five-

step evaluation *in sequence*. *Zurawski*, 245 F.3d at 885. Thus, the ALJ must consider

whether plaintiff's condition meets the listings without reference to vocational factors such

as education or work experience. 20 C.F.R. §§ 404.1520(d); 416. 920(d). Here, insofar

**17**

as the ALJ has determined plaintiff's speculative ability to work at home means her condition does not meet the listings, he has skipped this step, and proceeded to considered plaintiff's residual functional capacity. *Williams v. Apfel*, 48 F.Supp.2d 819, 824 (N.D.Ill. 1999)(where a plaintiff meets the listings, the agency inquires no further into the severity of the individual's symptoms or his functional abilities, age, education, or work history). The ALJ has, in effect, engaged in circular reasoning – plaintiff's residual functional capacity under step four prevents a finding of medical equivalence under step three – that is not allowed under the Commissioner's regulations. *See Galaspi-Bey v. Barnhart,* No. C-01-01770-BZ, 2002 WL 31928500, *2 (N.D.Cal. Dec. 23, 2002).

We also note that the ALJ did not engage in any comparison of plaintiff's limitations with those required in the listing. In regard to step-three determinations, courts have cautioned ALJs against the not only the failure to mention the specific listings they considered, but against the omission of any discussion of a plaintiff's impairments in connection with those listings. *Brindisi v. Barnhart*, 315 F.3d 783, 786 (7th Cir. 2003). Here, the ALJ points out the few positive signs in the record – that plaintiff does well in visual processing and non verbal problem solving, that she is responsible and conscientious, that she has talent in graphic arts (R. 18-19) – to the neglect of a rather lengthy catalog of plaintiff's deficiencies, which could be found in Ms. Wax's notes or elsewhere in the record. *See supra, at* 5-8. For example, in the very letter which the ALJ claims undermines Ms. Wax's opinion that plaintiff's condition meets listing 12.02, Ms.

**18**

Wax notes that plaintiff's "severe learning disabilities" render her emotionally fragile, unable to communicate effectively, follow a conversation, or understand or remember anything unless it is stated slowly and in short sentences. (R. 405). She also notes that plaintiff's impairment renders her unsuccessful in keeping a job for any length of time, and that the time it takes her to understand diminishes any opportunity for her to work. (R. 405). The ALJ makes no mention whatsoever of these findings (R. 19), all of which seem relevant to the listing's criteria of memory impairment, perceptual disturbance, decompensation in worklike settings, and restrictions in social functioning, concentration, and daily living. Many of these same limitations are echoed by other doctors or psychologists elsewhere in the record. *See supra, at* 5-8. By failing to discuss this evidence in light of the listing's analytical framework, "the ALJ has left this court with grave reservations as to whether his factual assessment addressed adequately the criteria of the listing." *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002).

The ALJ's determination that plaintiff's condition does not meet or equal a listed impairment is also undermined by the testimony of Dr. Kessler, the ME. The ALJ stated that "[a]s to the fact that claimant met medical listing 12.02, the medical expert did not agree." (R. 20). Review of the ME's testimony, however, reveals that his opinion regarding the listings was, at best, equivocal. While it is true that Dr. Kessler testified that he did not think plaintiff met or equaled listing 12.02 or 12.05, he also stated that the severity of plaintiff's learning disability "would equal the intensity of . . . either of those

listings. (R. 175). When addressing the specific requirements of listing 12.02, the ME indicated that plaintiff repeatedly suffered decompensation, but only moderate restrictions in daily living and social functioning, and that she seldom had deficiencies of concentration. (R. 168-169). This assessment would fall short of the criteria for listing 12.02(B). On the other hand, the ME also stated that plaintiff's difficulties with understanding and responding appropriately – which he felt were markedly limited – could be considered as limitations in concentration. (R. 170). Repeated episodes of decompensation and markedly limited concentration would meet the requirements of listing 12.02(B). Thus, Dr. Kessler's testimony can easily be interpreted as evidence that plaintiff's condition meets or equals a listed impairment. To the extent the ALJ relies on it to support his contrary conclusion, especially given what we find to be the ALJ's inadequate analysis of Ms. Wax's opinion and accompanying evidence, we must find the ALJ's step-three determination is not supported by substantial evidence. This matter must be remanded for a more thorough step-three analysis.

While these concerns are sufficient to warrant a remand of this case for a step-three evaluation, we will briefly address the issue of the ALJ's determination that plaintiff can perform her past relevant work as a photo lab technician. The regulations define past relevant work as work that was performed within the last fifteen years, lasted long enough for the claimant to learn how to do the job and was substantial gainful activity. 20 C.F.R. §§ 404.1565(a); 416.965(a). Based on the record, plaintiff's photolab job would seem to

**20**

just barely qualify. She had a great deal of difficulty learning the job, having to post instruction signs in her work area, which eventually drew the ire of her supervisor. Her difficulty in mastering the job without the signs and communication problems with her supervisor led, in part, to her having to leave the position. The issue of whether plaintiff's experience at the photo lab qualifies as past relevant work might have deserved a bit more than the glossing over the ALJ and the Commissioner's brief gave it.

In concluding that plaintiff retained the capacity to perform this past relevant work, the ALJ relied on the testimony of the VE. (R. 20-21). The hypothetical question an ALJ poses to a vocational expert ordinarily must include all limitations supported by medical evidence in the record. *Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002). Here, the ALJ asked the VE to consider limitations such as inability to process written or oral instructions, a stable work environment not requiring the ability to adapt, and an inability to deal with more than one person at a time. (R. 180). In response, the VE testified that such limitations would allow plaintiff to perform her past work as a photo lab technician at places that had not updated their equipment; perhaps only a third of such jobs.[2] (R.

---

[2]  There may be some question as to whether plaintiff's past relevant work even exists, given technological advances, but that issue is of no consequence to a disability determination. In *Barnhart v. Thomas*, – U.S. –, 124 S.Ct. 376 (2003), the Supreme Court held that a plaintiff could be found not disabled based on an ability to perform past relevant work without inquiry into whether that work actually existed. 124 S.Ct. at 380. Addressing the possibly "absurd" result in which a plaintiff would be denied benefits although she could perform no job that actually exists in the national economy, the Court explained that a conclusion that a plaintiff could perform past

(continued...)

181). By the same token, however, the VE also testified that plaintiff would be "impaired" by needing to use older technology. (R. 181). Whether being "impaired" meant a further limitation on plaintiff's ability to work in a photo lab was unclear. So, as with the ME's testimony, the VE's opinions were somewhat equivocal.

The degree of plaintiff's "impairment" was called into question when the plaintiff's attorney asked the VE to take into account plaintiff's deficiencies in interacting with supervisors, auditory comprehension, and busy environments with background noise. (R. 182). Certainly, the record supports the existence of these limitations and demonstrates that they have led to plaintiff's checkered work history, and it would seem they are not so different from those the ALJ posited. Yet, the VE testified that these problems would impact "very negatively" on her ability to hold a position like her photolab job. (R. 183). Like the ME's testimony, then, the VE's supports a finding that plaintiff, if not disabled, is at least unable to return to her past relevant work. This conflict in the VE's testimony – upon which the ALJ relied in finding plaintiff could perform her past relevant work – warranted at least some discussion in the ALJ's opinion. *Brindisi,* 315 F.3d at 786. Accordingly, a remand of this matter is appropriate on this basis as well.

---

[2](...continued)
work, even if it no longer existed, would in the vast majority of cases serve as an administrative proxy for a plaintiff's ability to do some work that does exist. 124 S.Ct. at 381-82. In the instant case, we are not so certain. The plaintiff's extremely limited success in holding any job seems to stem from the type of desperate effort or an altruistic employer mentioned in *Wilder v. Apfel,* 153 F.3d 799, 801 (7th Cir. 1998).

## III. CONCLUSION

For the foregoing reasons, the defendant's motion for summary judgment is DENIED, and the plaintiff's motion for summary judgment or remand is GRANTED and this matter is remanded to the Commissioner for further proceedings consistent with this opinion.

ENTERED: _____
**EDWARD A. BOBRICK**
**U.S. MAGISTRATE JUDGE**

**DATE:** MAR 0 3 2004